953 P.2d 959

**In the Matter of the TRUST ESTATE OF Gelacio Najorra DAOANG, Deceased.**

**No. 19830.**

Intermediate Court of Appeals of Hawai'i.

March 6, 1998.

Certiorari Denied April 13, 1998.

Manuel D. Garcia, on the briefs, Honolulu, for appellant.

Mal Gillin, on the brief, Honolulu, for appellees.

Before WATANABE, ACOBA and KIRIMITSU, JJ.

ACOBA, Judge.

We hold that Gelacio Najorra Daoang (Gelacio), by signing a letter sent by his attorney to confirm Gelacio's plans to amend his "self-trusteed revocable living trust" (the trust), sufficiently manifested his intent to amend the trust, even assuming the subsequent execution of a more formal document was contemplated. We further conclude that because Gelacio was in fact settlor and trustee his signature was not required to be designated as having been executed in those capacities. Consequently, the letter was a valid second amendment to the trust. Therefore, we vacate those contrary portions of the July 31, 1995 order and the April 25,

1996 judgment entered by the first circuit court (the court) and remand the case to the court to enter an instruction that the letter was a valid second amendment to the trust.

We also confirm that an "accumulation trust" is one in which the trustee accumulates income for some period of time before distributing it to the beneficiaries. While accumulation clauses may be implied as well as express, we conclude that the provisions of the trust do not evidence an intent by Gelacio to create an "accumulation trust" whereby surplus income would be accumulated until the trust terminated. Accordingly, we affirm those parts of the court's July 31, 1995 order and the April 25, 1996 judgment which permitted the trustee to disburse surplus income, except to the extent that our holding may affect the court's prior determination concerning disbursements of surplus income. To that extent and because the court's decision did not identify who the income beneficiaries are under the trust as amended, we remand for the court to determine who the income beneficiaries of the trust are and in what proportions they should receive income.

I.

On September 4, 1985, Gelacio established the trust, with Gelacio as settlor and as trustee. Gelacio died on September 9, 1991. On October 2, 1992, the court entered an order appointing Glen Takabuki (Takabuki) as trustee of the trust.

On August 16, 1994, Takabuki filed a petition for instructions with respect to five issues concerning the administration of the trust. Two issues are relevant to this appeal:[1] (1) whether the trust was amended, as asserted by Gelacio's wife, Appellant Elizabeth M. Daoang (Elizabeth), and (2) "whether it is permissible for [Takabuki] to distribute accumulated income which is determined not to be necessary for the maintenance of the [t]rust and its properties[,]" as urged by Gelacio's children, Appellees Benjamin Calija Daoang (Benjamin) and Rosita Daoang Yoro (Rosita) (collectively referred to herein as Appellees).

1. The other three issues are not before this court on appeal. The two issues contained in the successor trustee's supplemental request for instructions are also not before this court.

On July 31, 1995, the court issued findings of fact (findings), conclusions of law (conclusions), and an order in response to Takabuki's petition. With respect to the two issues we consider on appeal, the court concluded that (1) the July 23, 1990 letter from Gelacio's attorney, Leighton Wong (Wong), to Gelacio did not constitute a second amendment to the trust, and that (2) "[t]he trustee may disburse any excess income above what he determines to be a reasonable reserve for estate expenses in equal amounts to the beneficiaries annually."

On April 25, 1996, the court entered judgment on its July 31, 1995 findings, conclusions, and order.

On May 1, 1996, Elizabeth filed her notice of appeal, appealing only the instructions of the court set forth above.

## II.

Concerning the first issue on appeal, Elizabeth maintains that the July 23, 1990 letter from Wong to Gelacio "substantially conform[ed] to the formalities required under the trust agreement for amending the trust" and thus was a valid amendment. We do not agree with Appellees' contentions to the contrary, and conclude that the July 23, 1990 letter amended the trust.

### A.

The following facts, pertinent to the first issue, are not disputed by Elizabeth or Appellees.

Paragraph 31 of the trust document states, "This instrument may be amended in any respect, but *only by another instrument signed by both the Settlor and the Trustee during the Settlor's lifetime*." (Emphasis added.)

On September 14, 1988, Gelacio signed a document entitled a "First Amendment" to the trust. The document stated that "the Settlor has signed this amendment" and the word "Settlor" was typed following Gelacio's signature. This amendment provided for, *inter alia,* Elizabeth's right to reside at 41–

518–A Humupaa Place, Waimanalo, Hawai'i (the property) for fifteen years after Gelacio's death or until she remarried, whichever occurred first.

On July 17, 1990, Gelacio sent to Wong a typewritten and signed letter, which provided, in relevant part:

This is according to your instructions to my wife, per telcon [sic] on July 16, 1990. I have expressed my wish to make my wife, Elizabeth[,] a part of my "Living Will & Estate".

. . . .

So [Wong], I wish to make the following changes:[2]

1. Give her a durable Power of Attorney in my financial and medical affairs.

2. *Give her 1/3 of all my Estate and the rest to my heirs*

3. Besides what I have left her in my present Will, she can have whatever else she want [sic] to take

She has not pressured me into this in any way. I am doing this on my own free will and in my sound mind.

Please make these changes as soon as possible.

(Emphasis added.)

On July 20, 1990, Wong and Gelacio discussed by telephone the letter and the timing of the one-third distribution of Gelacio's estate to Elizabeth. As the court found, "[t]he only issue under discussion was the timing of the distribution, i.e., whether [Elizabeth] was to get 1/3 of the trust assets upon [Gelacio's] death or after [Elizabeth] ha[d] the right to reside in [sic] the [p]roperty for 15 years." The court further found that on the following day, "a message was left at [Wong's] office that [Elizabeth] was to get 1/3 of the trust assets after she reside[d] in [sic] the [p]roperty for 15 years."

Wong sent a letter dated July 23, 1990 to Gelacio concerning this instruction, with the heading "RE: Amendment of Trust[.]" The July 23, 1990 letter stated:

2. The first circuit court (the court) found that, in this letter, Gelacio Najorra Daoang (Gelacio) instructed Leighton Wong (Wong) "to make certain changes to [Gelacio's] trust[.]"

This letter is to confirm your phone message of July 21, 1990 in which you advised me that pursuant to your letter dated July 17, 1990, you wish for your estate to be distributed one-third to your spouse, and the remaining two-thirds to your heirs, after your wife has the right to reside on [the property] for 15 years.

If the above is a correct indication of how you wish to proceed, please sign below where indicated and return this letter to my office in the enclosed envelope. An extra copy of this letter is enclosed for your records.

If you have any questions, please don't hesitate to contact me.

At the bottom of the letter, the words "Approved and Agreed" were typed above a line with Gelacio's name and "Date" typed below the line.

Gelacio signed the July 23, 1990 letter[3] under the words "Approved and Agreed" and returned the letter to Wong. The court found that Gelacio "did not have his signature notarized as Settlor or trustee[.]" Wong received the letter, but did not subsequently discuss this issue with Gelacio at any time prior to Gelacio's death on September 9, 1991.

The court found that Wong "also drafted a more formal document called the [Second] Amendment to the Trust ... and sent this document to [Gelacio] on the same day as the [July 23, 1990] [l]etter, but through a separate mailing." The court further found that this document "was *never* signed by [Gelacio] and *there is no evidence to indicate that he ever received this document*, nor was the document returned to [Wong] as undelivered." (First emphasis in original; second emphasis added.)

Wong "testified that [Gelacio] was very reliable and usually 'follow[ed] up' on these matters[.]" Additionally, the court determined that "Gelacio was intelligent and was

mentally competent up to the date of his death on September 9, 1991."

B.

The court entered the following conclusions relevant to the issue of the trust's amendment:

7. The preponderance of the evidence is that [Gelacio] signed the letter dated July 23, 1990, indicating he "approved and agreed" on how he wished to proceed to amend the trust agreement; but *[Gelacio] did not specify that he signed in the capacity of either the settlor and/or as the trustee.*

. . . .

9. The method of exercising the power of modification or amending the trust as described in the trust Agreement was not observed by the Letter of July 23, 1990.

10. The [c]ourt concludes that [Wong's] drafting of a more formal document called the 2nd Amendment to the trust and sending it to [Gelacio] indicates that *[Wong] and [Gelacio] expected a more formal "instrument" to be executed by the settlor and the trustee* as previously done with the First Amendment of the Trust Agreement.

11. Based on [Gelacio's] previous actions, that he went about taking care of his other affairs before his death[,] and his total lack of any other attempt to amend the trust with a Formal Instrument in almost fourteen months before his death, *the [c]ourt concludes that the Letter dated July 23, 1990, as countersigned by [Gelacio,] does not constitute a second amendment to the trust.*

(Emphases added.) The following "finding"[4] is another conclusion relevant to the amendment issue:

Paragraph 31 of the trust instrument, together with the fact that the first amendment to the trust was accomplished by the

---

3. Two copies of the signed letter were admitted into evidence. Exhibit 13 is the copy submitted by Appellant Elizabeth M. Daoang (Elizabeth), and Exhibit 14 is the copy of the original letter. Apparently, Exhibit 14 is the "extra copy" of the letter included by Wong for Gelacio's records.

The court found that Gelacio signed the letter on July 23, 1990, but the copy of the letter

submitted by Elizabeth indicated that it was signed on July 26, 1990. This distinction is not material to our disposition.

4. This was designated finding 15 in the court's findings on the amendment issue.

execution of a formal "instrument[,]" indicate that something more than a letter was needed to accomplish the Second Amendment to the trust.

## III.

The court's conclusions are reviewed under the right/wrong standard. *Wharton v. Hawaiian Elec. Co.*, 80 Hawai'i 120, 122, 906 P.2d 127, 129 (1995). We believe the court erred in concluding that Gelacio did not amend the trust by signing the July 23, 1990 letter from Wong.

■ "The Settlor has power to modify the trust if and to the extent that by the terms of the trust he [or she] reserved such power." *Restatement (Second) of Trusts* § 331(1), at 143 (1959). The parties agree that, in paragraph 31 of the trust document, Gelacio reserved the power to amend the trust "in any respect, but only by another instrument signed by both the Settlor and the Trustee during the Settlor's lifetime."

Our supreme court has recognized that "[w]here ['a settlor reserves a power to modify a trust only in a particular manner or under particular circumstances, he [or she] can modify the trust only in that manner or under those circumstances.[']" *Miller v. First Hawaiian Bank*, 61 Haw. 346, 349 n. 5, 604 P.2d 39, 41 n. 5 (1979) (quoting *Restatement (Second) of Trusts* § 331 comment d, at 144 (1959)). The dispute here centers on whether, in signing the July 23, 1990 letter, Gelacio "modified" the trust in the manner specified by paragraph 31 of the trust document. By its plain terms, paragraph 31 requires two elements to be satisfied to effect a valid amendment to the trust: (1) "another instrument" which was (2) "signed by both the Settlor and the Trustee during the Settlor's lifetime." We consider whether these requirements were satisfied by the July 23, 1990 letter as signed by Gelacio.

### A.

■ On appeal, Elizabeth characterizes the July 23, 1990 letter as "the Daoang Instrument," indicating that she apparently believes the letter constituted an "instrument." It is not clear whether Appellees dispute this point. Appellees assert that the July 23, 1990 letter was not a valid amendment to the trust in part because "[Gelacio] had previously amended his trust by signing a separate instrument ( ... referred to as the First Amendment to the Trust)." However, we cannot discern, without further discussion of this point, whether Appellees mean to imply by this statement that the July 23, 1990 letter was not a "separate instrument."

■ The thrust of Appellees' argument concerning the "instrument" itself is that it was not a "formal second amendment" to the trust. It has been established that a "formal" document is not required to create a trust in this jurisdiction. In *Hawaiian Trust Co. v. Cropley*, 40 Haw. 38, 50–51 (1953), the supreme court held that the testator created an express trust by a series of letters between the testator and the secretary of an organization, which were "'read together as one *instrument* for the purpose of establishing the trust.'" *Id.* at 50 (quoting *Loring v. Palmer*, 118 U.S. 321, 339–40, 6 S.Ct. 1073, 1079–80, 30 L.Ed. 211 (1886)) (emphasis added). By reading the letters "in the light of all the facts and circumstances attending the transaction which would be presumed to be in the mind of the testator in doing what he did toward accomplishing his purpose[,]" the supreme court determined that the testator demonstrated his intention to create a trust and "took sufficient steps to put such trust into effect before he died." *Id.* at 51. In *Cropley*, the supreme court effectively considered a series of letters to be an "instrument."[5] Appellees do not advance any reason as to why a formal document would be

---

5. *Black's Law Dictionary* defines the term "instrument" both narrowly, as "[a] formal or legal document in writing, such as a contract, deed, will, bond, or lease[,]" and more broadly, as [a]nything reduced to writing[;] a document of a formal or solemn character[;] a writing given as a means of affording evidence[;] [a] document or writing which gives formal expression

to a legal act or agreement, for the purpose of creating, securing, modifying, or terminating a right[;] [a] writing executed and delivered as the evidence of an act or agreement[;] [or] [a]nything which may be presented as evidence to the senses of the adjudicating tribunal.
*Black's Law Dictionary* 801 (6th ed.1990) (citation omitted).

required to amend a trust, while not being required to create an express trust.

Furthermore, the fact that Gelacio may have, as contended by Appellees, "contemplated the subsequent execution of a formal trust instrument" should not be dispositive of the question of whether the July 23, 1990 letter constituted a valid amendment.[6] *Id.* In *Cropley*, the supreme court concluded that "the mere fact that the settlor contemplates the subsequent execution of a formal instrument [does not] necessarily negative the present creation of a trust, if its terms are sufficiently indicated." *Id.* (internal quotation marks and citation omitted). The terms of the amendment, to provide a one-third share of Gelacio's estate to Elizabeth after she resided on the property for fifteen years, were "sufficiently indicated" in the July 23, 1990 letter.

We thus believe that the July 23, 1990 letter constituted "another instrument."

### B.

■■■ Elizabeth argues that the July 23, 1990 letter "substantially complied with the method chosen for amending the Trust Agreement" because the letter was signed by Gelacio, who was both Settlor and Trustee at that time. On the other hand, Appellees contend that there was no valid amendment because Gelacio signed the letter "as an individual" and not "as Settlor and Trustee."[7]

In their October 12, 1994 memorandum in response to Takabuki's petition for instructions, Appellees stated that they "recognize[d]" the first amendment "as being a valid amendment to the trust." If we were to follow the strict construction of paragraph 31's signature requirement, as urged by Appellees on appeal, the first amendment to the trust would in fact *not* be a valid amendment because it was signed by Gelacio as "Settlor" only; nowhere on the first amendment did

Gelacio expressly sign as "Trustee." In acknowledging the validity of the first amendment document, Appellees apparently recognized that Gelacio's actual roles as settlor and trustee enabled him to sign the document as "Settlor" and execute a valid amendment to the trust.

Likewise, Gelacio was settlor and trustee at the time he signed the July 23, 1990 letter. Although the letter did not specifically designate either of these capacities, we believe that, given Gelacio's actual roles as settlor and trustee, Gelacio's signature was sufficient to meet the requirement that the amending instrument be "signed by both the Settlor and the Trustee during the Settlor's lifetime."

### C.

Therefore, we believe that the court was incorrect in concluding that the July 23, 1990 letter signed by Gelacio was not a valid amendment to the trust.

### IV.

With respect to the second issue on appeal, Elizabeth argues that the trust was an "accumulation trust" and the trustee does "not have any authority to make any trust distributions until the termination of the trust." In response, Appellees merely assert that the court, "within its sound discretion," "properly interpreted" paragraph 7(b), as set forth below, and "decided that the Trustee should be allowed to distribute excess income above what he determined to be a reasonable amount as a reserve for trust expenses" before the termination of the trust. We agree with Appellees' contention, although not solely based on the interpretation of paragraph 7(b).

### A.

The following findings relevant to the second issue are not disputed by the parties:

6. We note that it is not in fact clear that Gelacio did "contemplate[ ] the ... execution of a formal trust instrument" subsequent to signing and returning the July 23, 1990 letter. This letter did not refer to a formal instrument and the court found that there was no evidence that Gelacio received the formal agreement drafted by Wong.

7. Appellees Benjamin Calija Daoang and Rosita Daoang Yoro (collectively referred to herein as

Appellees) also observe that Gelacio's signature was not notarized on either the July 17, 1990 letter sent by Gelacio to Wong, or the July 23, 1990 letter countersigned by Gelacio. However, paragraph 31 of the trust agreement does not specify that Gelacio's signature must be notarized, and Appellees point to no other authority requiring signatures on trust amendments to be notarized in order to be valid.

2. There is no specific provision in the Trust Instrument and [the first amendment] which specifically provides for the distribution of any income to the beneficiaries.

3. Paragraph 7(b) of the Trust Instrument provides in part as follows:

Regardless of anything to the contrary in this instrument, during the three-year period following the Settlor's death, the Trustee *shall hold in trust* from time to time *such sum* [ ] as it determines, in its sole discretion, is likely to be required *for payment pursuant to such certification by the Settlor's personal representatives.*[8] *Any portion of the aforesaid sum* [ ] as is from time to time determined by the Trustee to be in *excess of the likely requirements of such certification* or remain[s] in the Trustee[']s hands unobligated by such certification *upon the expiration of the three-year period shall be transferred, held or disposed of by the Trustee* as the Trustee would have transferred, held or disposed of that portion if the Trustee had not been directed by this paragraph (b) to continue to hold it. . . .

. . . .

5. [Wong], who prepared the Trust Instrument and the First Amendment to the Instrument, testified that he understood the trust to be an "Accumulation Trust."

6. The Trust instrument and the [first] Amendment does [sic] not expressly provide that trust interest or income is to be added to the principal or corpus and preclude the distribution or disbursement of interest as income.

(Emphases added by the court.)

### B.

The court entered the following conclusions with respect to the second issue:

8. The beginning portion of paragraph 7(b) provides, in pertinent part:

The Trustee shall pay to the Settlor's personal representatives or to the taxing authorities and other obligees of the Settlor's estate such amounts as those personal representatives shall certify, within the three-year period following the Settlor's death, to be the extent to which the Settlor's estate after satisfaction of

1. *In the absence of specific provisions requiring that trust interest or income is to be added to principal or corpus and in the absence of any language prohibiting the distribution or disbursement of income,* subsequent to the three-year period mentioned in paragraph 7(b), the Trustee in his sound discretion may distribute income in excess of such amounts that are needed or anticipated to be required for trust expenses.

2. *The Trustee shall be allowed to disburse any excess income above what he determines to be a reasonable reserve* for the Trust Estate expenses, in equal amounts to be [sic] beneficiaries annually.

(Emphases added.)

### V.

### A.

■ While numerous Hawai'i cases have at least referred to an accumulation of trust income, apparently no case in this jurisdiction has specifically defined the term "accumulation trust." "A trust for accumulation is one in which the trustee is to refrain from paying out the income of the trust as it is received, and instead is to use such income for the purpose of increasing the value of the trust principal by investing the income or otherwise." G.G. Bogert & George T. Bogert, *The Law of Trusts and Trustees* § 215, at 258 (2d ed. 1992) [hereinafter *Law of Trusts*]. *See also Black's Law Dictionary* 22 (6th ed.1990) (defining an accumulation trust as "[a] trust in which the trustee is directed to accumulate income for a period of time before distribution").

■ Hawai'i appears to follow the general principle that "[a]ccumulation clauses may be implied as well as express[.]" G.T. Bogert,

all of the Settlor's specific and general devises and bequests and after redemption of any bonds pursuant to paragraph (a) of this Paragraph 7, is insufficient for the payment of the Settlor's funeral and administration expenses, the expenses incurred in transferring and delivering all bequests to the Settlor's legatees at their residences, and all estate, inheritance, succession and other death taxes. . . .

*Trusts* § 53, at 198 (6th ed. 1987) [hereinafter *Trusts*]. In *Fitchie v. Brown*, 18 Haw. 52 (1906), *aff'd*, 211 U.S. 321, 29 S.Ct. 106, 53 L.Ed. 202 (1908), the testator/settlor placed the balance of his estate "in trust for as long a period as is legally possible," and provided that "[o]n the final ending and distribution of the trust, the trust fund [should] be divided equally amongst those persons at that time entitled to the aforementioned annuities." *Id.* at 55–56. The supreme court held that "[t]he trust [at issue] *is implied* for accumulation of the income not required for taxes and for costs and charges of administering the trust and for payment of the annuities." *Id.* at 53 (emphasis added). Basing its holding in part on its interpretation of the term "trust fund," the supreme court reasoned that this term "implied that not merely the residue is intended to be divided but also the unapplied income accumulated at the time of the division." *Id.* at 72.

However, "courts are reluctant to make such implications." *Trusts* § 53, at 198 (6th ed.1987). This was illustrated in *Von Holt v. Williamson*, 23 Haw. 201 (1916). In that case, the testator placed certain property in trust, providing that, *inter alia*, income should go to the "proper support, maintenance, and education" of his daughter until she reached the age of twenty-one. *Id.* at 203. The guardian for the testator's grandchild argued that "the will contain[ed] no language to support an implied gift of income to the daughter" after age twenty-one and "therefore, it must be held that the income would necessarily accumulate and upon the daughter's death go to the grandchild or other beneficiary according to the terms of the will." *Id.* at 204. The supreme court observed that "[o]ne weakness in the position taken on behalf of the grandchild lies in the fact that the will contains no express provision for or reference to an accumulation of

the income...." *Id.* Furthermore, it noted that "it would be difficult indeed to attribute to a testator an intention to have income accumulate for grandchildren while a daughter lived for whom he had made no provision beyond that of maintenance and education until she attained the age of twenty-one years." *Id.* at 205.

■ Based on the foregoing, we agree with Elizabeth that the court was incorrect in concluding, as a general matter, that a trustee is free to distribute income "[i]n the absence of specific provisions requiring that trust interest or income is to be added to the property or corpus and in the absence of any language prohibiting the distribution or disbursement of income[.]" Even where no express accumulation provision is found in the trust document, courts have sometimes inferred one from the language of the document.

### B.

■ In reviewing the trust document at issue,[9] however, we do not believe that an implied accumulation provision is warranted in this case.

" 'A fundamental rule [when construing trusts] is that the intention of the settlor as expressed in a trust instrument shall prevail unless inconsistent with some positive rule of law.' " *Trust Created Under Will of Damon*, 76 Hawai'i 120, 124, 869 P.2d 1339, 1343 (1994) (quoting *In re Trust of Lopez*, 64 Haw. 44, 49, 636 P.2d 731, 735 (1981) (citations omitted)). We believe that the following provisions of the trust document evince the intent of Gelacio *not* to have the trust income accumulate until the trust terminated.

■ We observe first that paragraph 7(b) does not mandate that the trustee hold trust assets.[10] As Elizabeth acknowledged in her

9. The first amendment to the trust and the July 23, 1990 letter, which we have held, *supra*, was a valid second amendment to the trust, did not contain any provisions which would instruct us in determining whether Gelacio intended to establish an accumulation trust.

10. The fact that paragraph 7(b) requires the trustee to hold a certain sum for expenses does not lead to the conclusion that an accumulation

trust was intended or established. "A direction to withhold income temporarily and pay it out later as income is not a provision for accumulation in a technical sense." G.G. Bogert & G.T. Bogert, *Law of Trusts* § 215, at 258 (2d ed.1992). *See also In re Weill's Trust Estate*, 48 Haw. 553, 563, 406 P.2d 718, 723 (1965) (noting that the presence of a clause in the will requiring the trustee to accumulate income to pay certain expenses "tends to negative any intention of the

memorandum regarding the petition submitted to the court, "[a]t the expiration of three years, the last sentence of said paragraph 7(b) *allows* the Trustee to dispose of Trust assets *as if* he had not been directed by said paragraph 7(b) to hold in trust an amount the Trustee determines would likely be required by the personal representative." (Emphases in original.)

In fact, other provisions of the trust appear to assume that income in excess of a reserve for trust expenses would be distributed. Paragraphs 9 and 10 provide that income not paid out before the termination of the trust would then be distributed. Paragraph 9 states:

> Upon such termination by the Trustee, the Trustee shall transfer all of the trust property, *including any unpaid income* [,] absolutely and free from any trust, to the Settlor, if he is alive, or if not, then to the Settlor's issue, [Benjamin], HENRY CALIJA DAOANG, and [Rosita], *per stirpes and not per capita.*

(Emphases added.) Paragraph 10 includes essentially the same provision.

Paragraph 12 vests powers in the trustee to generally effect distribution of assets as follows:

> [T]o effect distribution of property in kind or in money and in divided or undivided interests, and to allocate property among shares and adjust resulting differences in valuation; and generally exercise the same control over and rights with respect to the trust estate as could be exercised personally by an absolute owner of the trust property.

Paragraphs 15 and 21 both refer to "income beneficiaries," implying that payments of income could be made before the trust terminated. Paragraph 17 expressly contemplates payments to be made "prior to the termination of the trust."

Paragraph 15 states, "Upon the death of any *income beneficiary,* the interest of that beneficiary in all *undistributed income* shall terminate, regardless of when it shall have accrued, and all such income shall be distributed as though it had accrued immediately after the death of that beneficiary." (Emphases added.)

In paragraph 17, Gelacio specifically permitted payments to be made "to or for the benefit of a beneficiary who is under legal disability" "prior to the termination of the trust."

In paragraph 21, Gelacio allowed for "[p]ossession of any or all household goods and personal effects at any time included in the trust estate [to] be given, in the Trustee's discretion, to any one or more of the *current income beneficiaries* [.]" (Emphasis added.)

Paragraph 21(c)(2) directs the trustee to "annually deliver an account to each adult income beneficiary and to a parent or guardian of each minor income beneficiary."

We believe that the most persuasive argument against Elizabeth's interpretation is found in the language of paragraph 20, which provides:

> 20. *This instrument shall be liberally construed in the interest and for the benefit of the current income beneficiaries,* and the exercise of any discretion of the Trustee in favor of any current income beneficiary shall be absolutely binding on all successor income beneficiaries and remaindermen; provided, that this Paragraph 20 shall not be deemed to limit any discretion herein conferred upon the Trustee.

(Emphasis added.) Concluding that income should be accumulated to the principal of the trust for distribution upon its termination would be contrary to the "liberal[ ] constru[ction] in the interest and for the benefit of" beneficiaries designated as "current income beneficiaries" under paragraph 20. Although the document does not specifically name the "current income beneficiaries" or the proportion of income they may receive, as noted by Elizabeth, we do not believe that these facts compel the conclusion that no distribution may occur before the trust is terminated. Rather, the absence of specific instructions on these issues appears to be

---

testatrix that accumulation of any part of the net income of the trust estate should or might be made for any reason or purpose other than that specifically authorized by the clause").

consistent with the broad discretion conferred on the trustee, as explicitly provided for in paragraph 20, set forth above.

We note that our interpretation of the trust language and our conclusion that no accumulation trust was intended or established are consistent with the general policy against accumulations, explained as follows:

> It has been urged that an accumulation trust is disadvantageous to society in that it enables the building up of great fortunes and the concentration of wealth in the hands of an individual or a family; and also that it is in the public interest to have those who are temporary beneficiaries of a trust enjoy the income of the trust which accrues during the period of their equitable ownership rather than to give the benefits of it to members of a later generation, with possible consequent suffering and deprivation to the present generation.

*Law of Trusts* § 215, at 258–59 (2d ed.1992).

We believe that the court was correct in concluding that the trust document does not prohibit the trustee from distributing income to the beneficiaries of the trust. However, because our holding that the July 23, 1990 letter constituted a valid second amendment to the trust may affect the court's findings with respect to the accumulation issue and because the court did not determine who the *income* beneficiaries of the trust are, we remand the accumulation issue to the court. The court used the term "beneficiaries" to describe Elizabeth and Appellees throughout its findings and conclusions, but it is unclear whether the court determined that the parties are also "income beneficiaries" for purposes of disbursements of surplus income. Thus, we remand to the court for such determination.

## VI.

For the foregoing reasons, the instruction in the July 31, 1995 order and the corresponding portion of the April 25, 1996 judgment concerning the validity of the July 23, 1990 letter as an amendment to the trust are vacated, and the case is remanded to the court to enter an instruction that such letter constituted a valid second amendment to the trust. The instruction and corresponding part of the judgment concerning the disbursement of income to beneficiaries are remanded, and the court is instructed to determine who the income beneficiaries are and in what proportions disbursements should be made. The April 25, 1996 judgment is affirmed in all other respects.